Filed 11/26/24  In re S.E. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.E., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> H.E., <br><br> Defendant and Appellant. | F088001 <br><br> (Super. Ct. No. JD144534-00) <br><br><br> **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Alexandria M. Ottoman, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Franson, Acting P. J., Peña, J. and DeSantos, J.

In this juvenile dependency case, appellant H.E., father to minor S.E., appeals from the juvenile court's order made at the 12-month status review hearing (Welf. & Inst. Code,[1] § 366.21, subd. (f)) terminating his reunification services. Father contends the court's failure to find there was a substantial probability of the return of S.E. to his custody within the statutory time period was error, and, to the extent the court relied on father's housing situation in ordering father's reunification services be terminated, its finding that the Kern County Department of Human Services (department) had provided reasonable services finding was not supported by sufficient evidence with regard to housing assistance.

Finding no error, we affirm the juvenile court's findings and orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

In April 2023, the department received a referral alleging father had not provided suitable living conditions for then seven-year-old S.E. It was reported there were rats in the house, no working kitchen or bathroom, and no bedrooms. Mother did not live in the home, and her whereabouts were unknown.

When the investigating social worker responded to the residence, she observed the home was in disrepair, and no one was home. She later made contact with S.E. where she was staying with acquaintances of father. They reported S.E. stayed with them a few nights a week but otherwise lived with father in his residence, which was not suitable for a child. S.E. appeared comfortable with the couple but was wearing dirty clothes, had matted hair, and was suffering from lice. They reported they had concerns about father's ability to care for S.E. and that he had treated her poorly in their presence.

The social worker was subsequently unable to contact father and obtained a school warrant to speak to S.E. S.E. reported she lived with father, her uncle and her uncle's

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2.

girlfriend in the home in disrepair where the social worker initially responded and had lived there a long time. She reported the toilet did not work, and there was only cold water in the home; if she needed to shower, she would go to the home where she was staying with father's acquaintances. She further reported there were three bedrooms in the home: one she shared with father, one her uncle and his girlfriend shared, and one that was the "smoke" room that she was not allowed in. She stated the adults in the home smoked cigarettes and also described what the social worker believed was a bong. She further reported the kitchen sink did not work, and the refrigerator only had rotten food in it. She reported she had not eaten dinner the night prior or breakfast that morning. She stated father yelled at her and used profanity and called her names when he got mad. She recalled an incident where father had spanked her in the street, and law enforcement later responded. She told the social worker she lied to law enforcement by telling them father did not spank her because she did not want them to take father from her.

Later that day, after speaking with S.E., the social worker sought law enforcement's assistance in contacting father and locating S.E. Father did not cooperate and gave several false addresses where S.E. was staying, but S.E. was eventually located at father's residence. Law enforcement believed father was trying to hide S.E. S.E. was placed in protective custody, and father was placed under arrest. Law enforcement reported father had a methamphetamine pipe on his person at the time of his arrest and described the home as not being appropriate for a child due to safety hazards and a lack of provisions. When speaking with the social worker, father denied that S.E. lived in the home and stated he did not use illicit substances.

The department filed a juvenile dependency petition on behalf of S.E. on April 18, 2023. The petition alleged she was at risk of harm under section 300, subdivision (b)(1) due to father's failure to provide adequate shelter as the home had no running water and exposed electrical wiring inside the home and failure to provide regular care due to

3.

substance abuse, as he used methamphetamine and had exposed S.E. to ongoing secondhand smoke. S.E. was placed into protective custody, and the juvenile court subsequently ordered S.E. detained from both parents.

A contested jurisdiction hearing was conducted on May 18, 2023. Father testified and denied living at the residence and stated he was in the process of moving. He denied methamphetamine use and reported the meth pipe he had on his person was taken from the backyard of the residence when he was cleaning it up. The juvenile court sustained the dependency petition, noting it did not find father's testimony credible, as it conflicted with S.E.'s and other witnesses' statements in the department's reports, and continued the matter for disposition.

The department's disposition report noted father had been "minimally cooperative" with the department in providing information. Father initially attended visits and the quality was noted to be "appropriate." However, the department later reported father stopped showing up for visits and was dropped from the visitation schedule in July 2023 for failure to appear for multiple visits. A couple of weeks after being dropped, father stated he had had transportation issues but wanted to begin visiting again. Father had not participated in his voluntary case plan, as he was "busy." He stated he would drug test once it became court ordered.

The disposition hearing was conducted on August 2, 2023. S.E.'s counsel submitted on the recommendation for reunification services, noting S.E. loved father very much. The juvenile court adjudged S.E. a dependent of the court, ordered her removed from the parents' custody, and ordered father to participate in reunification services, including counseling for child neglect/parenting training and substance abuse and submit to random drug testing. Mother was denied services under section 361.5, subdivision (b)(10).

The department's six-month status review report dated January 23, 2024, recommended father's reunification services be continued. As of the date of the report, father had not enrolled in substance abuse counseling and had not submitted to random drug testing nor drug testing for the department. He had completed 11 out of 26 parent and child neglect counseling sessions. He was inconsistent with visits and had only attended 11 out of 23 scheduled visits. When father attended visits, they were reported to go well.

The six-month status review report detailed several contacts between the social worker and father. In October 2023, father reported to the social worker his family was selling his house, and he did not know where he was going to go. He was upset and did not want to discuss the topic further. In November 2023, he reported he lost his home because his family had sold it. He agreed to accept services through Bringing Families Home to obtain housing. He had already been referred, and the social worker told him she would update his contact information with them. In December 2023, he reported he was staying with family. Father later reported he needed to figure out his housing situation, and the social worker reminded him of the housing support the department offered.

The six-month review hearing was conducted on February 2, 2024. The court found father had made minimal progress toward alleviating or mitigating the causes necessitating placement and that he had minimally made acceptable efforts and minimally availed himself of services. The court continued father's reunification services.

The department's 12-month status review report recommended termination of father's reunification services. The department reported that father had enrolled into substance abuse counseling in December 2023 and participated in inpatient treatment from December 2023 until March 2024. He had completed counseling for parenting/child neglect. He had drug tested for the department, with one presumed

positive on February 2, 2024, and negative tests for all substances from February 23, 2024 to April 5, 2024. Father's visits had gotten more consistent, and they were reported to go well. The department reported father was meeting all case plan components except for failing to drug test on February 2, 2024. The department opined that "father is starting to make significant behavioral changes however not enough to confidently send the child home," as father had not consistently drug tested nor shown insight into his substance abuse problem and did not have housing.

The report documented several contacts between the social worker and father throughout the review period. In March 2024, father reported he had completed residential substance abuse treatment and was planning on staying, as he was struggling with housing. He reported being sober for "a few months" but was hesitant when asked what his preferred substance was. He denied any substance use related to methamphetamine, fentanyl, heroin, alcohol, or marijuana. With regard to housing, father stated he had spoken with the Open Door Network and was told they did not have any more funding to assist parents with housing. The social worker asked if he had family he and S.E. could live with, and he said, yes. The social worker advised father if he could find an appropriate place for them to live, he could reapply for CalWORKS when he and S.E. reunified, which would provide him with access to more housing support programs.

Later that month, father reported he had reached out to Bringing Families Home, Housing Authority, and 211 and no one could help him with housing "as soon as possible." The social worker advised father to speak to family members or family friends to see if he and S.E. could stay with them and informed father that adults would need to undergo a background check and home inspection for placement with S.E. and explained family maintenance services to him. Father reported his cell phone was "confiscated in a

raid." He had been sleeping on someone's couch, and someone had died in the backyard. He did not know the person who owned the home.

The social worker subsequently discovered from father's counselor that father had tested positive for methamphetamine on several occasions during his inpatient substance abuse treatment. In April 2024, when the social worker confronted father about learning this from his counselor, father responded, "She told you that?" Father was hesitant to admit to substance use but eventually admitted he began using methamphetamine when he was around 16 or 17 years old. He had relapsed in February 2024, but had been clean since then. He stated he had used methamphetamine to cope, as he had a tough time raising S.E. on his own with minimal family support. He wanted to obtain sobriety to reunify with S.E.

As for housing, father had been referred to Bringing Families Home, but the program ran out of funding for the fiscal year. He contacted 211 and placed himself on waitlists, as there were no available options. The social worker informed father the Housing Authority had several listings scheduled to open in May. Father said his cell phone screen was broken, and the social worker informed father he could use a computer at the Law Library or the Kern County Public Library. Father stated he planned to talk to his AB429 social worker about his housing options through the department. Father stated he had asked several family members if he could stay with them, but he stated they either did not want CPS involved or did not want him in the home. The social worker encouraged him to keep asking and to highlight his progress with sobriety. The social worker gave father information about what was needed for a home to be cleared, and father said he would ask two more family members.

S.E. was in a recent placement, as she had been moved from a placement where she was living for several months due to mistreatment by foster siblings. Her current care provider expressed behavioral concerns and reported she could not provide permanency

7.

to S.E. due to the care provider's age. S.E. was being treated for mood swings and aggression, inattention, and hyperactivity and receiving mental health services. She enjoyed her home and wished for her care provider or her foster sisters to obtain legal guardianship of her. She did not respond when asked if she wanted to reunify with father but wanted to continue visiting with him on a regular basis.

The 12-month status review hearing was conducted on May 6, 2024. Father requested an extension of reunification services, noting visits were going well and argued "significant progress has been made," based on his participation in services.

Minor's counsel stated S.E. was happy in her current placement and wanted to remain there. She did not want to return to father "any time soon" but "d[id] not object to any visits." Counsel objected to extension of services, arguing there was not a substantial probability that S.E. would be returned to father given his lack of insight regarding his substance use and his sobriety being "quite recent."

County counsel also argued there was not a substantial probability of return, stating, "[t]he issue is drugs, and I'm also not sure about the housing situation with [] father as well." She stated father "barely" had two and a half months of sobriety, and given his lengthy history of methamphetamine use, this was not enough and that he had waited several months to engage in his case plan.

Father's counsel represented that father had been working with the housing authority, and his housing should be stabilized by the section 366.22 hearing, if granted.

In ruling, the juvenile court noted that in order to extend services, it would have to find a substantial probability that S.E. would be returned to father by October. Specifically, the court was looking to whether (1) father had consistently and regularly visited; (2) made significant progress in resolving the problems that led to removal; and (3) demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety and well-being. The court indicated the "problem"

8.

was the second and third prongs of the analysis. Because the progress was so recent, the court could not find father had made "significant" progress nor that he had demonstrated the capacity and ability to complete the objectives of the treatment plan. The court noted the decision was a "tough" one because S.E. was being recommended for a planned permanent living arrangement and that father and S.E. had a close bond, but the court could not "make the evidence fit to meet these three prongs."

The court found father's progress toward alleviating or mitigating the causes necessitating placement had been minimal and that father had made minimally acceptable efforts and had minimally availed himself of services. The court found the return of S.E. to father's custody would create a substantial risk of detriment to her safety, protection, or well-being and there was not a substantial probability that S.E. would be returned to father within six months, and ordered reunification services terminated. The court further found by clear and convincing evidence that S.E. was not a proper subject for adoption and that no one was willing to accept legal guardianship. The court ordered placement in foster care with a permanent plan with a fit and willing relative. The court noted father still had the opportunity to reunify with S.E. and that if father completed his case plan on his own, the court "would be happy to have a [section] 388 [hearing] to discuss either further services or a family maintenance order at that time."

## DISCUSSION

### I.     Failure to Find Substantial Probability of Return

Father contends the court erred by failing to find there was a substantial probability of return of S.E. to his custody within the statutory time. We disagree.

If, at a section 366.21, subdivision (f) hearing, a child is not returned to the custody of a parent or legal guardian,[2] the court may only continue the case provided that

---

[2]     Father does not challenge the court's finding that return of S.E. to father's custody would create a substantial risk of detriment.

9.

the hearing shall occur within 18 months of the date the child was originally taken from the physical custody of their parent or legal guardian and "only if [the court] finds that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (§ 366.21, subd. (g)(1).)

In order to find a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time, the court is required to make all of the following findings:  (1) "[t]hat the parent or legal guardian has consistently and regularly contacted and visited with the child"; (2) "[t]hat the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home"; and (3) "[t]he parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  (§ 366.21, subd. (g)(1)(A)-(C).)

We review for substantial evidence a court's factual findings supporting an order terminating reunification services.  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.)  Under this standard, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders.  [Citation.]  'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' "  (*Id.* at pp. 688–689.)  When examining the evidence supporting the trial court's findings, we bear in mind the clear and convincing evidence standard where required.  (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)  Where, as here, "the issue on appeal turns on a failure of proof at trial, the question for a

reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) Specifically, the question is whether the evidence was "(1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid*.)

We conclude the evidence did not compel the court to find a substantial probability of return; specifically, the court's finding that father's progress was not significant was reasonable and supported by the evidence. While it does not seem to be disputed that father began addressing his substance abuse issue, he did not begin to do so until December 2023, eight months after the initial referral that led to the dependency proceedings. He tested positive while in treatment, denied substance use before *and* after finishing his substance abuse program until confronted with positive tests, and relapsed in February 2024. Given father's great delay in engaging with services and only approximately 10 weeks of continuous sobriety, the court could reasonably find his progress was not "significant" in the context of the circumstances of the case as well as father's long history of methamphetamine use.[3]

We are not persuaded by father's argument that the juvenile court was required to extend his services because S.E. was to remain in foster care, and no section 366.26 hearing was set. Father cites *In re Alanna A.* (2005) 135 Cal.App.4th 555 to support the proposition that "where a nonreunifying parent is likely to have continued contact with his child, further services to that parent may be in the child's best interests." *Alanna A.*

---

[3]    Father asserts that the juvenile court "erroneously said [he] had only two months of drug testing where he had three months." We do not find any error with the court's comment. Father's first negative test was February 23, 2024, and he had three subsequent negative tests, and the 12-month review hearing was conducted on May 6, 2024. That would be documented sobriety of approximately 10 weeks. We do not think the court characterizing 10 weeks as two months could be constituted error so as to undermine its findings in any substantive way.

11.

does not assist father. Despite making the above observation, the *Alanna A.* court found that the juvenile court did not err by terminating a parent's reunification services when the other parent's services were continued because the juvenile court had "reasonably concluded that [the nonreunifying parent's] performance did not merit continued reunification services" in applying the standards for extension set forth in section 366.21, subdivision (g)(1)(A), (B), and (C). (*Alanna A.*, at p. 565.) Here, because we find the court did not err in its determinations under section 366.21, subdivision (g), the fact that a section 366.26 hearing was not set did not compel the court to order continued reunification services. Father cites no authority that requires a court to continue reunification services when it cannot make the required findings under section 366.21, subdivision (g).

For the foregoing reasons, we find no error by the court declining to find there was a substantial probability of the return of S.E. to father within the statutory time. We note the juvenile court did appear to be open to reconsidering should father continue to make progress, and we encourage father to do so and commend him for the efforts he has made thus far to get sober. We express no opinion on how the juvenile court should rule on any future request for modification or any other request for further services or placement father may make.

## II. Finding that Reasonable Services Were Provided

Father also argues that to the extent the juvenile court relied on father's housing situation to support the order, the court's finding that the department provided father with reasonable reunifications services was error with regard to assisting father with housing. We find no error.

As a threshold matter, the department contends father forfeited this issue by failing to raise it before the juvenile court. We decline to find that father forfeited the issue because he contested the department's recommendation to terminate reunification

services, which required the department to prove that it provided reasonable services. (See *In re Javier G.* (2006) 137 Cal.App.4th 453, 464 ["when the merits of a case are contested, a parent is not required to object to the agency's failure to carry its burden of proof"].)

We next note father has not established that the case plan required the department to help father obtain housing. The case plan does not appear to be a part of the record on appeal. We acknowledge, however, that father's lack of suitable housing was a primary reason for S.E.'s removal. Had the case plan not included this issue, it would have been something that father should have addressed at the disposition hearing. (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1476 [a parent "waive[s] her right to complain [about a reunification plan] by consenting to the terms of the plan"].) We note at the disposition hearing, father insisted housing was not an issue, and denied that S.E. lived in the home that was found to be in disrepair.

Assuming only for the purpose of father's argument that providing housing assistance was part of the department's responsibilities as set forth in the case plan, we find the evidence supports the finding he was provided reasonable services.

The reasonableness of the department's efforts are judged according to the circumstances of the case. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426; *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) "To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult.' " (*Tracy J.*, at p. 1426.) "The social services agency must make a 'good faith effort' to provide reasonable services that are responsive to each family's unique needs. [Citation.] 'The standard is not whether the services provided

were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*In re J.E.* (2016) 3 Cal.App.5th 557, 566.)

We review the juvenile court's reasonable services finding for substantial evidence. (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 419–420.) We view the evidence in the light most favorable to the juvenile court's ruling, resolving conflicts and indulging all reasonable inferences in favor of the finding. (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 545.)

We conclude the court's reasonable services finding was supported by substantial evidence. The department made contact with father frequently and assessed his living situation. At the outset of the proceedings, father appeared to be living in his residence and working on fixing it up. In October 2023, when father informed the social worker that his family was planning on selling the house, and then in November 2023, when father reported the home had in fact been sold and he was homeless, the department made housing referrals and continued to check in with father regarding his housing situation.[4] Prior to entering residential substance abuse treatment, father indicated he was staying with family, and after he was discharged in April 2024, he began engaging with the housing services to which he was referred. Father's efforts resulted in him being put on waitlists, and in the meantime, the department encouraged father to live with family members and gave him information on the requirements for placement of S.E. The record demonstrates the department stayed in contact with father and provided referrals, suggestions, and information that reasonably met the assistance father stated he required and the obstacles he faced as the case progressed, which was unfortunately necessarily

___

[4]     Though father is only challenging the reasonable services finding made at the 12-month status review hearing, we include information from the six-month review period to provide more context for our analysis. Based on father's circumstances and his expression of what his needs were, the department reasonably assisted father. His need for housing, as opposed to addressing the issues in his residence, did not appear to arise until after he completed residential treatment during the six- to 12-month review period.

limited to the confines of what was available through the entities to which father was referred. Eventually, it appears, father did get a concrete opportunity to obtain housing, as according to father's counsel at the 12-month status review hearing, he was working with the housing authority to obtain housing at that time. In his briefing, father does not suggest what else the department could have done.

For the foregoing reasons, we conclude the juvenile court's finding that the department's efforts were reasonable under the circumstances of the case was supported by substantial evidence and not error.

## **DISPOSITION**

The juvenile court's findings and orders are affirmed.